**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-00099-NYW

AMY LAVERNE WALKER,

     Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

     This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33, for review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Amy Walker's ("Plaintiff" or "Ms. Walker") application for Disability Insurance Benefits ("DIB"). Pursuant to the Parties' consent [#13], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#19]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court **AFFIRMS** the Commissioner's decision.

## LEGAL STANDARDS

     An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C.

§ 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12

consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002). Additionally, the

claimant must prove she was disabled prior to her date last insured. *Flaherty v. Astrue*, 515 F.3d

1067, 1069 (10th Cir. 2007).

The Commissioner has developed a five-step evaluation process for determining whether

a claimant is disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). These include:

1. Whether the claimant has engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment or combination of impairments;

3. Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4. Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5. Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). *See also Williams v. Bowen*, 844

F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "The claimant bears the

burden of proof through step four of the analysis[,]" while the Commissioner bears the burden of

proof at step five. *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). "If a determination

can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent

step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation

marks omitted).

In reviewing the Commissioner's final decision, the court limits its inquiry to whether

substantial evidence supports the final decision and whether the Commissioner applied the correct

legal standards. *See Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty*, 515 F.3d at 1070 (internal citation omitted); *accord Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) ("Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). "But in making this determination, [the court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016). However, the court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty*, 515 F.3d at 1070.

## ANALYSIS

### I.      Background

#### A.      Medical History

Ms. Walker, born April 16, 1967, alleges she became disabled November 12, 2015, at 48 years-of-age, due to degenerative disc disease[1] and "fusion in back with extreme pain everyday [sic]." *See* [#12-6 at 285, 299].[2] In 2011, Ms. Walker underwent a L5-S1 microdiscectomy to "treat primarily right lower extremity symptoms including weakness and pain." [#12-7 at 406]. In 2013, Ms. Walker's physician Sanjay Jatana, M.D. noted Ms. Walker had "a significant amount of back pain and was somewhat frustrated that her [L5-S1 microdiscectomy] did not fix the back

---

[1] Because Ms. Walker's appeal focuses exclusively on her degenerative disc disease, the court limits its discussion of the relevant medical record to this ailment.

[2] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

pain." [*Id.*].   X-rays showed Ms. Walker suffered from "degenerative disc disease at L5-S1 and L1-L2."  *See* [*id.* at 407].   Noting Ms. Walker had attempted a medial branch block and steroid injections, Dr. Jatana explored other options, ultimately suggesting a second surgery.  *See* [*id.* at 400-02, 404, 407].

Ms. Walker underwent the recommended procedure, a fusion at L5-S1, on November 19, 2013.  [*Id.* at 412-13].   While Ms. Walker's immediate post-op visits note her doing well, *e.g.*, [*id.* at 396, 398], she suffered a slipping incident about three months after her surgery that caused "worsening lower back pain," *see* [*id.* at 394].   Six months after surgery, Dr. Jatana noted "recurrent symptoms" and "minor irritation" resulting from a straight leg test, that Ms. Walker's pain remained a 5-8 out of 10, and that x-rays showed the "fixation in place and alignment acceptable."  [*Id.* at 392-93].   Given his physical examination, Dr. Jatana ordered another MRI.  [*Id.* at 393].   The MRI showed adequate decompression that "look[ed] appropriate in terms of assessing the fusion mass" and considered other reasons for her reported pain.   [*Id.* at 390].   Notably, these MRI "findings [were] slightly worse compared to the MRI dated April 2, 2013," which occurred before Ms. Walker's second surgery.  *See* [*id.* at 420].

On July 7, 2014, Ms. Walker presented to her family physician Vernon Rubick, D.O.  *See* [#12-2 at 59; #12-8 at 503].   Dr. Rubick's notes indicate Ms. Walker began experiencing bi-lateral knee pain, which she attributed to her physical therapy, and that she continued to report back pain, though she did not report an inability to bear weight or a loss of range of motion and sensation.  [#12-8 at 503-04].   During an August 2014 visit, Ms. Walker reported feeling depressed because of her pain, requested an antidepressant, and later reported the medication was helpful; a physical exam revealed normal range of motion and no edema, and Dr. Rubick noted there "are no obvious

issues that [he] was able to find on exam" as to Plaintiff's chronic left hip, knee, and foot pain. [*Id.* at 506-08, 509].

Ms. Walker's medical records also detail three visits to Kenneth P. Finn, M.D. at Springs Rehabilitation, P.C. *See* [#12-7 at 384-87]. Visit notes from January 2, 2015 indicate Ms. Walker had "a medial branch block done on the lower lumbar spine bilaterally. Unfortunately, she did not have a significant response. Her pain decreased a little bit, perhaps a couple levels from 7/10 down to 5/10." [*Id.* at 387]. During her exam, Dr. Finn noted "tenderness," "some pelvic rotation as well and some up-slip of the SI joint of the left side," as well as "positive Patrick's maneuver." [*Id.*]. Dr. Finn's treatment plan was a "sacroiliac injection," and he stated, "I am not sure we have much else to offer her." [*Id.*]. During her next visit, Dr. Finn noted injections did not create the desired result, stating "[Ms. Walker] has been through a series of injections . . . . We have not been able to change her low back pain." [*Id.* at 384]. Dr. Finn's notes ended with, "[a]t this point, we really do not have much else to offer her in terms of injections. I would have her return to Dr. Jatana. She is getting some relief with pain medications, but frustrated with the lack of response." [*Id.*].

Ms. Walker visited Dr. Jatana again on June 15, 2015. [#12-7 at 388-390]. Dr. Jatana noted "worsening symptoms as far as lower back pain and some referred symptoms when her back pain increases down into the legs bilaterally." [*Id.* at 388]. Ms. Walker reported "pain with any kind of increased activity level or sitting for extended periods of time." [*Id.*]. An x-ray showed "good placement" of the hardware in her spine and the "[a]djacent segment appears to be well maintained." [*Id.*]. The physical examination noted "5/5 muscle strength" and nonpainful rotation of the hips, no pain with extension maneuvers, no tenderness over the bursa, but "[p]ain noted with forward flexion." [*Id.*]. Dr. Jatana then ordered an updated MRI; compared to Ms. Walker's 2014

MRI the findings were "normal," with "evidence of postop changes status post anterior decompression and fusion" and "no evidence of nerve root impingement or cauda equina compression." [*Id.* at 389, 410]. Impressions included "minimal, if any, degenerative changes of the L4-5 disc space." [*Id.* at 410-11].

Ms. Walker continued visits with Dr. Rubick in 2015 and 2016. *See generally* [#12-7 at 424-58]. During a March 10, 2015 visit, Ms. Walker again reported back pain, and due to her "long history" of the same. [#12-8 at 516]. Her physical exam showed normal range of motion for her musculoskeletal system. [*Id.* at 518]. Through continued visits, Ms. Walker's physical exams continued to show no positive results for her musculoskeletal system, including the lower back, with "normal range of motion" and "no edema." [*Id.* at 520, 525]. But during her annual wellness exam in October 2015, Ms. Walker was positive for back pain, as well as "arthralgias (left knee/hip)," and "numbness (lower extremities/feet)," while negative for gait problems and other musculoskeletal and neurological issues. *See* [*id.* at 526].

Also in October 2015, Ms. Walker visited Demaceo L. Howard, M.D., a pain management specialist, presenting with low back pain. *See* [#12-7 at 451]. Her patient history labels her pain "moderate-severe," that it "radiated to the left calf, left foot and left thigh," and noted the "problem is stable," though "[e]pidurals and facet treatments not effective post fusion." [*Id.*]. Ms. Walker identified extremity weakness and numbness, gait disturbance, back and joint pain, and muscle weakness as her physical ailments, but a physical exam showed her gait, straight leg test on right and left, and muscle tone as normal, and all systems were normal in her physical exam. [*Id.* at 451-52]. Ms. Walker and Dr. Howard discussed new treatment options, including neurostimulation therapy and Ms. Walker decided to pursue the treatment. [*Id.* at 448, 450, 453]. Dr. Howard also discontinued Ms. Walker's use of hydrocodone, in lieu of oxycodone, reporting

"[d]ecreased pain control with current medications."  [*Id.* at 448, 450].  While waiting for authorization on the neurostimulation trial, Dr. Howard noted increased use of her pain medications was helpful.  [*Id.* at 442].

During a visit on April 21, 2016, Dr. Howard's records note "the problem is worsening" as Ms. Walker presented with back and leg pain, but her physical exam was largely normal. [#12-7 at 432-33].  In May of 2016, Ms. Walker "cancelled her scheduled Phase 1 neurostimulation trial" due to cost and returned to oxycodone for pain management.  *See* [*id.* at 428, 430].  Later treatment notes indicate Ms. Walker's "problem is worsening," and an August 2016 visit showed "tenderness" of her lumbar spine and "moderate pain" resulting from motion of the same, though these visits included normal physical exam results. [*Id.* at 429; #12-8 at 462].

In September 2016, Ms. Walker saw Dr. Howard for another epidural steroid injection. *See* [#12-8 at 460].  Ms. Walker returned in December 2016, and Dr. Howard's plan was to "[c]ontinue medication management."  [#12-9 at 590].  Her history detailed her lower back pain as "ache, burning, discomforting numbness and throbbing," which was "aggravated by ascending stairs, daily activities, descending stairs, jumping, lifting, standing and walking" and "relieved by lying down, pain meds/drugs and rest."  [*Id.* at 591].  She reported her pain as a 9/10 and her physical exam included "normal" findings for both her musculoskeletal and neurological systems. [*Id.* at 592].

On October 3, 2016, Ms. Walker presented to Dr. Rubick and requested he complete paperwork for her DIB application.  [#12-8 at 530-31].  Visit notes state Ms. Walker's pain as a constant and "chronic problem" that "started more than 1 year ago."  [*Id.*].  Dr. Rubick further noted "[t]he problem has been gradually worsening since onset," that it is "present in the lumbar spine," it "radiates to the left thigh," and is "severe."  [*Id.*].  He also noted this pain is "aggravated

by bending, sitting, standing and twisting." [*Id.*]. In terms of treatment, Dr. Rubick stated "[Ms. Walker] has tried analgesics, NSAIDs and muscle relaxant [sic]," which has "provided moderate relief." [*Id.*]. The physical exam showed a "decreased range of motion (flexion, extension, side bending and rotation) and tenderness" in Ms. Walker's back but "not edema and no deformity." [*Id.* at 531].

On January 31, 2017, Ms. Walker returned to Dr. Howard, whose treatment notes state Ms. Walker's pain "level is 6-8," that it is "stable," "persistent[,]" and in the lower back, "radiat[ing] to the left calf and left thigh." [#12-9 at 596-97]. Ms. Walker described the pain as "an ache, burning, discomforting, piercing and shooting" that is "aggravated by daily activities, jumping, lifting, sitting, standing and walking" and "relieved by lying down and pain meds/drugs." [*Id.*]. Later visits include reports of back and knee pain consistently, with hip pain fluctuating. *See* [*id.* at 606, 610, 614, 618]. Throughout her visits to Dr. Howard in 2017, Ms. Walker reported muscle weakness. *See* [*id.* at 598, 602, 607, 611, 615, 619].

Ms. Walker again visited Dr. Rubick for a steroid injection for her hip on July 19, 2017. [#12-8 at 557-58]. Physical examination showed tenderness in her hips and decreased range of motion in her back. [*Id.* at 559]. A summary of care from October 16, 2017 also noted decreased range of motion in her back and tenderness. [*Id.* at 565]. Diagnosis included "[d]egeneration of lumbar intervertebral disc" and "[l]umbar radiculopathy." [*Id.* at 571].

### B.    Procedural History

On June 8, 2016, Plaintiff filed her application for DIB. [#12-2 at 84]. The Social Security Administration denied Plaintiff's application administratively on September 15, 2016. *See* [*id.*; #12-4 at 95]. Ms. Walker requested a hearing before an Administrative Law Judge, *see* [#12-4 at 103], which ALJ Bryan Henry ("the ALJ") held on January 31, 2018, *see* [#12-2 at 30]. The ALJ

received testimony from the Plaintiff and Vocational Expert Dr. Dennis Duffin (the "VE") at the hearing. *See generally* [*id.* at 40-82].

Ms. Walker testified to living with her husband, who is on long-term disability, and two dogs, in a one-story home. [#12-2 at 43-44]. She and her husband "tag-team the chores," from dishes, to "easy meals," and light cleaning. [*Id.* at 44-45]. While not requiring help with dressing or bathing, Ms. Walker stated her children help with "heavy stuff" when it comes to chores. [*Id.* at 45]. Ms. Walker further testified she has grandchildren who she visits with, but cannot babysit, has a driver's license, and makes shopping trips about two to three times a week with her husband. [*Id.* at 46-47, 62]. When shopping, Ms. Walker testified she can lift a gallon of milk.

Ms. Walker testified that she worked in sales for over a decade before taking a data entry job, which required her to sit 95 percent of the day at a computer. [#12-2 at 48-52]. She stated she left the job because she was "coming home, just in tears, from being in so much pain" in her knees and back, and that she had numbness in her leg, right calf, and toes, which moved to her left side after her fusion surgery. [*Id.* at 50, 52-53]. Ms. Walker stated, "I got a sense of pride" from working, "[b]ut I simply can't do it anymore." [*Id.* at 81-82].

As to her physical limitations, Ms. Walker testified she usually can carry objects under ten pounds "for a short distance," can lift items off a table, but it is hard to lift items off the floor. [#12-2 at 63]. She stated stooping is tough and if she bends her knees, she "can't hardly get up." [*Id.*]. She detailed her need to lay down twice a day and to stretch for "[u]sually about half-an-hour to an hour, each time" to "alleviate some pain." [*Id.* at 64-65, 67]. She testified she can walk a couple blocks at a time, but then requires rest. [*Id.*]. When questioned by her attorney, she discussed how she has assistive bars throughout her home and uses a tool to help reach items above and below arm's length. [*Id.* at 69-70].

For treatment, Ms. Walker testified to taking six hydrocodone and three morphine a day, as well as an antidepressant—all of which affected her concentration; that she attended physical therapy; that she stopped seeing Dr. Jatana because his office was located too far away; and that she declined neurostimulator therapy due to its costs. [*Id.* at 53-55, 60-62]. Despite all this, Ms. Walker testified that she is "never not in pain," which usually is a 5/10 but escalates "upwards of nine most days," though her pain medications provide some relief when taken together. [*Id.* at 68].

The ALJ then took the testimony of the VE. [#12-2 at 70]. The VE summarized Ms. Walker's past relevant work to include a data entry clerk, a specific vocational preparation ("SVP")[3] of 4, and a sedentary job; a sales associate, SVP 3, and a light exertion job; and a store manager, SVP 7, and a light exertion job. [*Id.* at 72-73].

The ALJ then posed several hypotheticals to the VE, regarding physical ability and applicable jobs. [#12-2 at 70-77]. Relevant here, in response to each of the hypotheticals, the VE testified that such an individual could perform Ms. Walker's past work as a data entry clerk (as well as other jobs existing in the national economy) despite increased limitations on that individual's functionality. *See* [*id.* at 72-77]. But the VE did testify that an individual could not perform Ms. Walker's past work as a data entry clerk or any work existing in the national economy if that individual was off task more than ten percent of the work day or missed more than one day of work per month. *See* [*id.* at 77-78].

---

[3] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

Plaintiff's counsel also posed two hypotheticals to the VE based on the limitations supplied by Dr. Howard, *see* [#12-8 at 497-99], and Dr. Rubick, *see* [*id.* at 551-53]. *See* [#12-2 at 78-81]. In response to both hypotheticals, the VE stated there was no work for such an individual; they could neither perform any of Ms. Walker's past relevant work, nor were there any other jobs in the national and state economy for them. *See* [*id.* at 79-81]. The VE concluded his testimony was not in conflict with the Dictionary of Occupational Titles ("DOT") and he relied on his over 30-years of experience to fill areas not covered by the DOT. *See* [*id.*].

On April 19, 2018, the ALJ issued a decision denying Plaintiff's application for DIB. [#12-2 at 9]. The ALJ concluded Ms. Walker:

1. had met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since the alleged onset date;

2. had the severe impairments of: degenerative disc disease of the lumbar spine with post-laminectomy syndrome;

3. had no impairment or combination of impairments that met or medically equaled a listing; and

4. had the RFC to perform light work, subject to various limitations, including the ability to perform her past relevant work as data entry clerk.

[#12-2 at 14, 16, 23-25]. Thus, at step four the ALJ determined Ms. Walker was not disabled. [*Id.* at 23-25].

Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner. *See* [*id.* at 1]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on June 29, 2018, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

On appeal, Ms. Walker challenges the ALJ's the RFC assessment asserting the ALJ erred in weighing the opinion medical evidence and in evaluating Ms. Walker's subjective complaints of pain. *See* [#16; #18]. I consider each in turn.

## II. The RFC Assessment

In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including the severe and non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016). A claimant's RFC is the most work the claimant can perform, not the least. 20 C.F.R. § 404.1545; SSR 83-10. "'The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")). The ALJ need not identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category," and the court will uphold the RFC assessment if it is consistent with the record and supported by substantial evidence. *See Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004).

The ALJ determined that Ms. Walker retained the RFC to perform light work, subject to several physical limitations in her ability to sit, stand, carry, and lift, and with the ability to change positions often to alleviate discomfort so long as Plaintiff remained on-task. [#12-2 at 16]. In so concluding, the ALJ undertook a thorough analysis of the objective medical record (which the court recounted above), the medical opinions, and Ms. Walker's testimony. *See* [*id.* at 16-23].

Ms. Walker argues, however, the ALJ erred by improperly weighing the medical source opinions and improperly assessing Ms. Walker's testimony regarding her ailments and limited functionality. *See* [#16 at 16-22; #18].  For the following reasons, I respectfully disagree with Ms. Walker.

### A.    Weighing the Medical Source Opinions

In assessing a claimant's RFC, the ALJ must also address medical source opinions.  *See Vigil v. Colvin*, 805 F.3d 1199, 1201-02 (10th Cir. 2015).  The Social Security regulations afford a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *cf. Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1071 (D. Colo. 2016) ("The distinction between *not inconsistent* and *consistent* is significant.  The treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, but they do not necessarily have to reach the exact same conclusions."  (emphasis in original)).  Generally, the opinion of an examining source is entitled to more weight than the opinion of a non-examining source.  *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527(c)(1).  Indeed, the opinion of a treating or examining source is in no way "dismissable," *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), and may be dismissed or discounted only upon an examination of the factors provided in the regulations and "specific, legitimate reasons for rejecting it[,]" *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).

Even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. § 404.1527(c)(1)-(6).  *See Watkins*, 350 F.3d at 1300; SSR 96-2p, 1996 WL 374188, at *4.  These factors include:

1. the length of the treatment relationship and the frequency of examination;

2. the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;

3. the degree to which the physician's opinion is supported by relevant evidence;

4. consistency between the opinion and the record as a whole;

5. whether or not the physician is a specialist in the area upon which an opinion is rendered; and

6. other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted). Ultimately, the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks omitted).

Relevant here, the ALJ considered three medical opinions, including the State agency doctor Virginia Thommen, M.D., and Plaintiff's treating physicians Drs. Rubick and Howard. I consider each in turn.

### 1. Dr. Thommen

Upon review of the medical evidence at the time Ms. Walker applied for DIB, Dr. Thommen opined Ms. Walker could occasionally lift 20 pounds; could frequently lift 10 pounds; could walk, sit, and stand about 6 hours out of an 8-hour workday; could push and pull without limitation; could frequently climb stairs and ramps; could occasionally climb ladders, ropes, and scaffolds; could occasionally stoop; could frequently kneel and crouch; and could occasionally crawl. *See* [#12-3 at 89-90]. Though noting its consistency with the medical evidence available at the time, the ALJ afforded Dr. Thommen's opinion "some weight." [#12-2 at 20-21]. The ALJ explained Dr. Thommen's opinion "does not reflect the claimant's reduced capacities" in standing,

walking, climbing, balancing, and other postural activities. *See* [*Id.* at 20]. Nor did Dr. Thommen's opinion include environmental limitations or the need for Ms. Walker to shift from sitting to standing throughout the workday as the ALJ found. *See* [*id.* at 20-21].

In passing, Ms. Walker challenges the ALJ weighing of Dr. Thommen's opinion, because Dr. Thommen did not consider Ms. Walker's use of morphine or the aggravation of Ms. Walker's pain caused by sitting, and the ALJ failed to consider Dr. Thommen as a non-treating source entitled to less weight than treating sources. *See* [#16 at 14]. But the ALJ <u>did</u> acknowledge that Dr. Thommen rendered her opinion "after a review of the record," and the ALJ sufficiently explained the weight assigned to Dr. Thommen's opinion and the reasons for that weight with citations to evidence in the record. I find no error in the ALJ's analysis in this regard. *See Golden-Schubert v. Comm'r, SSA*, 773 F. App'x 1042, 1050 (10th Cir. 2019) (finding that the ALJ implicitly acknowledge a state agency physician was a non-treating source and then adequately specified the weight assigned to that opinion and why, with citations to evidence in the record).

### 2. Dr. Rubick

Dr. Rubick offered two treating source opinions. I consider each in turn.

*Opinion 1*. The first was a Physical Residual Functional Capacity Questionnaire provided by the Social Security Administration. In it, Dr. Rubick noted he treated Ms. Walker for degenerative disc disease and listed the prognosis as poor as evidenced by her chronic back and left lower extremity pain, left straight leg test, and tenderness in her lumbar spine. [*Id.* at 497]. As to her physical limitations, which were present since April 2011, Dr. Rubick opined Ms. Walker could:

- walk two city blocks before needing to rest or experiencing pain, with the need to walk for 5 minutes every hour;

- sit for up to 30 minutes before needing to stand;

- stand for up to 10 minutes before needing to sit or walk around;

- sit, walk, or stand less than two hours a day;

- frequently lift and carry less than 10 pounds, occasionally 10 pounds, and rarely 20 pounds;

- could occasionally climb stairs, rarely twist, bend, and crouch, and could never climb ladders

[*Id.* at 498-99]. Additionally, Dr. Rubick opined Ms. Walker would need 15-minute unscheduled breaks every day as well as a job that allowed her shift positions from sitting, standing, or walking at-will. [*Id.*].

The ALJ assigned partial weight to Dr. Rubick's first opinion. [#12-2 at 21]. After summarizing the opinion, the ALJ found some of Dr. Rubick's assessment supported by the evidence, but found the "degree of limitations in sitting, standing, the need for unscheduled breaks, and limitations in stooping[,] twisting and crouching" unsupported by the evidence. [*Id.*].

Ms. Walker argues the ALJ "painted over the entire record with a singular gloss," and did not "provid[e] any nexus between identified data points and the conclusions reached." [#16 at 14]. The Commissioner argues the ALJ is "not required to 'apply expressly' every relevant factor for weighing the opinion evidence." [#17 at 16]. To be sure, the ALJ need not expressly consider every relevant factor in weighing a treating source's medical opinion, but the ALJ must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham*, 509 F.3d at 1258. "[C]itation to the inconsistent evidence" can satisfy this requirement. *Golden-Schubert*, 773 F. App'x at 1050. The ALJ undertakes a lengthy discussion of the relevant medical evidence both before and after addressing Dr. Rubick's first opinion and notes the inconsistencies between this opinion and others, Plaintiff's own testimony, as well as with the objective medical evidence,

such as largely normal MRIs and physical exams. Thus, I find the ALJ sufficiently explained his finding as to Dr. Rubick's first opinion.

*Opinion 2*. Dr. Rubick's second opinion is a Listing Questionnaire provided by the Social Security Administration. [#12-8 at 500]. On the questionnaire, Dr. Rubick opined Ms. Walker suffered from degenerative disc disease, resulting in "compromise of a nerve root . . . or the spinal cord," which caused neuroanatomic distribution of pain in Ms. Walker's "left lower extremity." [*Id.*]. Dr. Rubick stated Ms. Walker's medical condition equaled Listing 1.04 Disorders of the Spine as of April 2011 based on a "positive straight leg raise – left" test. [*Id.* at 501]. The ALJ found the second opinion of Dr. Rubick earned "little, if any weight" because the ALJ again found the opinion inconsistent with the record. [#12-2 at 21]. The ALJ stated the second opinion was contrary to MRIs in the record showing no nerve root impingement, and the ALJ was unpersuaded by the singular test listed as supporting evidence. [*Id.*].

Plaintiff argues the ALJ did not afford the correct amount of weight to Dr. Rubick's second opinion because the ALJ "did not consider . . . the treatment relationship." [#16 at 14]. "The ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). And the treatment relationship is an important factor for an ALJ to consider, but it is just one of six factors. *See Langley*, 373 F.3d at 1119. But the ALJ is not to required to afford a treating source opinion controlling weight when it is contradicted by the record and the ALJ explains his rationale for assigning less weight to that opinion. *See Rael v. Berryhill*, 678 F. App'x 690, 694-95 (10th Cir. 2017). Here, the ALJ appropriately pointed to the conflicts in Ms. Walker's medical history when assigning little weight to Dr. Rubick's second opinion: the ALJ

explained that Dr. Rubick's opinion was contrary to Ms. Walker's MRIs. [#12-2 at 21]. I find this sufficient; thus, the ALJ did not err in evaluating Dr. Rubick's second opinion.

### 3. Dr. Howard

The medical record contains three opinions from Dr. Howard. I consider each in turn.

***Opinion 1***. Like Dr. Rubick, Dr. Howard also completed a Physical Residual Functional Capacity Questionnaire. [#12-8 at 551-53]. Dr. Howard diagnosed Ms. Walker with post-laminectomy syndrome based on Ms. Walker's physical examination and medical history as well as positive straight leg raising test, reflex changes, muscle spasm, and impaired sleep. [*Id.* at 551]. As to her physical limitations, which were present as of December 5, 2016, Dr. Howard opined that Ms. Walker could:

- sit for 30 minutes before needing to get up, with the need to elevate her legs every 5 minutes;

- stand for 10 minutes before needing to sit or move;

- sit, stand, and walk for less than two hours in an eight-hour workday, and walk and stand with the use of an assistive device;

- frequently lift and carry less than 10 pounds, occasionally 10 pounds, and never 20 pounds or more; and

- never twist, stoop or bend, crouch, climb ladders, or climb stairs.

[*Id.* at 552-53]. He stated Ms. Walker needed a job that allowed her to walk for 5 minutes every 5 minutes, to change positions from sitting to standing at-will, and to take 5-10-minute unscheduled breaks about every 10 to 15 minutes. [*Id.*].

The ALJ gave this opinion "little weight." [#12-2 at 22]. The ALJ found the limitations asserted by Dr. Howard were "unsupported by the record, and largely inconsistent with the other opinions found in the records, as well as the claimant's own testimony." [*Id.*]. Plaintiff challenges the ALJ's finding and argues that Drs. Howard and Rubick offered consistent opinions. [#16 at

15].  The Commissioner contends that Drs. Howard and Rubick offered "relatively extreme opinions" and that the ALJ explained his reasons for rejecting these opinions "both before and after [the ALJ's] discussion of Dr. Howard's and Dr. Rubick's opinions."  [#17 at 15-16].  Again, I respectfully agree with the Commissioner.

The court assumes that the ALJ's reference to Dr. Howard's opinion as inconsistent with other opinions refers to the inconsistency between the opinions of Dr. Howard and Dr. Thommen—a point both Parties generally accept.  *See* [#16 at 17; #17 at 15].  But this inconsistency does not appear entirely fatal to Dr. Howard's opinion because the ALJ largely discredited Dr. Thommen's opinion for its failure to account for some of Ms. Walker's reduced capacity and other limitations.  [#12-2 at 20].  Further, despite some variances regarding Ms. Walker's postural limitations, Drs. Howard and Rubick's opinions reflect a similar degree of limitations in many areas, including Ms. Walker's ability to sit, stand, walk, lift, and carry; her need to take regular unscheduled breaks; and her need to shift positions at-will.  *Compare* [#12-8 at 497-99] *with* [*id.* at 551-53].  And while "treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, they do not necessarily have to reach the exact same conclusions."  *See Garcia*, 219 F. Supp. 3d at 1071.

Nevertheless, the ALJ's RFC assessment contains a thorough discussion of the relevant medical record.  In recounting these records, the ALJ first considered Plaintiff's testimony and statements regarding her ailments and limited functionality, stating that Ms. Walker can perform light housework and basic hygienic tasks but has complained of back and lower body pain consistently with no relief.  *See* [#12-2 at 17-18].  The ALJ then discussed the relevant medical evidence, which demonstrated that Plaintiff complained of back and lower body pain, exaggerated by activity, that she experienced inconsistent relief from various treatments, and that objective

medical tests were largely normal and unremarkable. *See* [*id.* at 19-20, 23]. And while the medical evidence could support a finding of greater limitations, it is the ALJ's responsibility to resolve such inconsistencies in the record. *See Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016). Accordingly, I find no error in the ALJ's weighing of Dr. Howard's first opinion.

*Opinion 2*. On November 1, 2016, Dr. Howard completed a Listing Questionnaire, wherein he opined Ms. Walker had degenerative disc disease that did not compromise the nerve root or spinal cord and she did not have a medical condition that equaled a listing. [#12-8 at 545-46]. The ALJ improperly attributed this opinion to Dr. Rubick and gave it "some weight" because although some evidence supported it, it was contradictory to Dr. Rubick's prior opinion that Plaintiff's degenerative disc disease met Listing 1.04, *see* [#12-8 at 545-46]. [#12-2 at 21]. Despite improperly attributing Dr. Howard's second opinion to Dr. Rubick, I find this indiscretion harmless. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005) (defining harmless error as any indiscretion that occurs where "no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." (ellipsis and internal quotation marks omitted)). This is because the ALJ was correct to note that Dr. Howard's Listing Questionnaire conflicted with Dr. Rubick's Listing Questionnaire, *compare* [#12-8 at 500-01] *with* [*id.* at 545-46], and the ALJ (not the court) must resolve any inconsistencies between medical source opinions, *see Smith v. Colvin*, 821 F.3d 1264, 1268 (10th Cir. 2016) (affirming the ALJ's "arriv[al] at an assessment between the two medical opinions without fully embracing either one."); *cf. Rael*, 678 F. App'x at 694-95 (finding no error where the ALJ explained his rationale for weighing treating source opinions that were contradicted by other medial opinions). The ALJ then continued that evidence supported the opinion; indeed, the ALJ agreed that Plaintiff suffered from "degenerative disc disease that did not result in compromise of the nerve root, but resulted in

neuroanatomic distribution of pain, and a limitation of motion of the spine" and that Plaintiff's degenerative disc disease did not meet Listing 1.04. *See* [#12-2 at 21-22]. And given the ALJ's discussion of the relevant medical evidence, I find no error in the ALJ's consideration of Dr. Howard's second opinion.

*Opinion 3*. Dr. Howard's last medical opinion was a Residual Functional Capacity Form dated January 4, 2018. [#12-9 at 623-27]. Dr. Howard stated Ms. Walker's symptoms included "chronic low back pain and bilateral low back pain from 2 previous back surgeries" and that she suffered from "Chronic Pain," "Post-Laminectomy Syndrome," and "Left leg weakness." [*Id.* at 623]. Dr. Howard listed his prognosis as guarded, with "probable life long [sic] back and leg pain" that has either lasted or would last one year or more. *See* [*id.* at 624]; *see also* [#12-8 at 551]. As to her physical limitations, Dr. Howard opined Ms. Walker could stand for about 15 to 30 minutes and sit upright for about 15 minutes because "[s]he has severe pain escalation when she stays in either the sitting or standing position," which required Ms. Walker to lie down during the day to alleviate pain; walk one quarter mile without stopping; consistently reach up above her shoulders, handled with her fingers, rarely reach down to waist level or towards the floor, and frequently carefully handle objects; and carry and lift 5-10 pounds and could do so "regularly/daily." *See* [*id.* at 624-26]. Dr. Howard stated Ms. Walker is very credible and that there is an objective medical reason for her pain and that he did not believe Ms. Walker could perform any gainful employment due to intractable pain. [*Id.* at 626].

The ALJ assigned partial weight to this opinion. [#12-2 at 22]. The ALJ pointed out Dr. Howard did not cite clinical findings or test results to "substantiate his opinion" and did not provide any results for the treatments listed, leaving those parts of the form blank. [*Id.*]. The ALJ gave no weight to Dr. Howard's characterization of Ms. Walker as disabled, because, "20 CFR 404.1527(d)

clearly states that the final responsibility for deciding the issue of residual functional capacity and the ultimate issue of disability for the Social Security Administration is reserved to the Commissioner." [*Id.* at 23]. Lastly, the ALJ found it notable that Dr. Howard opined Ms. Walker could walk for one quarter mile without stopping, because it was "inconsistent with his other opinion, the other opinions on the record, and the claimant's own testimony." [*Id.* at 22].

Plaintiff argues the ALJ tended to ignore factors like the treating relationship and specialty in discrediting Dr. Howard's opinions, and the ALJ did not account for Ms. Walker's use of morphine beginning in May of 2017, which Dr. Howard's opinion did account for. [#16 at 16-18]. The Commissioner replies that the ALJ is not required to consider all relevant factors in his opinion and, overall, the conflicting evidence is greater. [#17 at 16]. The Commissioner further contends that Plaintiff's argument regarding morphine are unavailing because only Dr. Howard's third opinion post-dates Plaintiff's morphine use. *See* [#17 at 16-17].

An ALJ must discuss the evidence supporting his decision, "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). This is especially true when weighing medical source opinions. An ALJ "'is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.'" *Chapo*, 682 F.3d at 1292 (quoting *Haga*, 482 F.3d at 1208). But there is no requirement that an ALJ make an explicit determination as to each factor and will uphold an ALJ's weighing of a treating source opinion if the ALJ makes clear the weight assigned to and the reasons supporting that medical opinion. *See Oldham*, 509 F.3d at 1258 (stating that the court will uphold the ALJ's weighing of medical opinions if the ALJ provides specific and clear reasons for the weight assigned).

As to Dr. Howard's third opinion, the court finds no error in the ALJ's assessment. Again, relying on the inconsistent medical evidence, which included inconsistent medical source opinions and objective findings, the ALJ concluded the opinion was entitled partial weight. The ALJ specifically noted, as with Drs. Rubick's and Howard's other opinions, "the record contains multiple MRI's [sic] that present objective evidence of a lack of nerve root impingement over time" and no objective imaging or testing after Plaintiff's alleged onset supports her subjective complaints of pain. *See* [#12-2 at 23]. Further, the ALJ noted the inconsistencies between Plaintiff's assertions that steroid injections were unsuccessful and her continued receipt of such injections. *See* [*id.*]. Though the evidence could support an inference that Ms. Walker is more limited than found by the ALJ, it is not the court's role to re-weigh the evidence, *see Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000); nor may the court "displace the agency's choice between two fairly conflicting views," *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (brackets omitted).

**B.      Credibility[4]**

"'Credibility determinations are peculiarly the province of the finder of fact' and the [court] will uphold such determinations, so long as they are supported by substantial evidence." *Ruh v. Colvin*, No. 13-CV-01255-PAB, 2015 WL 1517392, at \*2 (D. Colo. Mar. 30, 2015) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). "Credibility determinations should not be conclusory, but instead 'closely and affirmatively linked' to evidence in the record." *Oliva v. Colvin*, No. 13-CV-02495-PAB, 2015 WL 5719645, at \*7 (D. Colo. Sept. 30, 2015) (quoting

---

[4] Though SSR 16-3p superseded SSR 96-7p and eliminated the term "credibility", SSR 16-3p offers the same guidelines for ALJs to use in assessing a claimant's subjective complaints of symptoms and pain. *See* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). For this reason, the court will refer to this challenge as one speaking to Ms. Walker's credibility. *See Watts v. Berryhill*, 705 F. App'x 759, 763 n.4 (10th Cir. 2017).

*Kepler*, 68 F.3d at 391)).  In addition to considering the objective medical evidence, the ALJ must also consider several factors, including the claimant's daily activities; the location, duration, frequency, and intensity of her pain; aggravating and mitigating factors; any medication taken and its effectiveness in providing relief; other treatment received aside from medications; other measures utilized to alleviate pain, *i.e.*, lying down; and any other factors that may bear on the claimant's functional limitations.  *See* 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016); *Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010).  But the ability to perform daily activities on a sporadic basis does not equate to the claimant being able to engage in substantial gainful activity; nor may an ALJ rely on minimal daily activities to find that the claimant does not suffer from disabling pain.  *Proctor v. Astrue*, 665 F. Supp. 2d 1243, 1256 (D. Colo. 2009).

In considering Ms. Walker's subjective complaints about her back and lower body pain, the ALJ began with a recitation of Ms. Walker's Function Report.  *See* [#12-2 at 17].  The ALJ noted that Plaintiff experienced pain daily, requiring her to take pain medications and constant breaks, but Ms. Walker could still perform light housework and basic hygienic tasks.  *See* [*id.*].  The ALJ then recounted Ms. Walker's hearing testimony that largely reflected her statements in her Function Report.  *See* [*id.* at 18].  Then, as discussed above, the ALJ then undertook a lengthy discussion of the relevant medical evidence, including objective medical imagining and testing as well as medical source opinions.  *See* [*id.* at 18-23].

Ms. Walker argues the ALJ erred in assessing Ms. Walker's subjective complaints by misinterpreting Plaintiff's medical records, ailments, received treatments, and medical source opinions; disregarding Ms. Walker's need to lie down and use of morphine to alleviate pain; and mischaracterizing Ms. Walker's daily activities.  *See* [#16 at 19-22].  The Commissioner counters that the ALJ provided an adequate narrative for discounting Ms. Walker's subjective complaints;

considered properly Ms. Walker's various treatments and the results of those treatments; and properly characterized Ms. Walker's activities. *See* [#17 at 12-14]. I respectfully agree with the Commissioner.

To start, for many of the reasons discussed above, the court finds no error in the ALJ's recitation of the relevant medical evidence. And while the evidence could lend itself to a finding that Ms. Walker's testimony was more credible than the ALJ found, the court may noy reweigh the evidence. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (holding that the ALJ's credibility determination was supported by substantial evidence, and noting "Plaintiff's argument to the contrary constitutes an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner, an invitation we must decline."). Second, and relatedly, the ALJ considered the course of treatment Plaintiff received and acknowledged Plaintiff's statements about the need to lie down but found these inconsistent with the objective medical evidence. This is not reversible error merely because Ms. Walker disagrees with this conclusion, as inconsistencies in the objective medical evidence is a legitimate reason for discrediting a plaintiff's credibility. *See Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004) (noting that "the consistency or compatibility of nonmedical testimony with objective medical evidence" is a relevant factor in assessing a claimant's credibility); *accord* SSR 96–7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

Finally, the ALJ's reliance on Ms. Walker's daily activities was but one reason to discredit Ms. Walker's subjective complaints, but it is not accurate to classify the ALJ's reliance as improper. This is because the ALJ relied overwhelmingly on the objective medical evidence to discredit Ms. Walker. *See Purdy v. Berryhill*, No. 16-CV-00169-NYW, 2017 WL 897845, at *12

(D. Colo. Mar. 6, 2017) (finding no error where the ALJ relied in part on the plaintiff's daily activities in discrediting the plaintiff's subjective complaints where the ALJ relied largely on the objective medical evidence). And as Plaintiff concedes, the ALJ need not undertake an explicit factor-by-factor analysis so long as she "sets forth the specific evidence [s]he relies on in evaluating the claimant's credibility, *Keyes–Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012) (internal quotations and citations omitted) ([C]ommon sense, not technical perfection, is [the court's] guide."). Therefore, the court concludes that any error in mischaracterizing Plaintiff's daily activities is harmless, as substantial evidence supports the ALJ's RFC credibility determination. *See Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (upholding the ALJ's credibility determination because it was linked to substantial evidence; noting "[o]ur precedents do not require more").

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.


DATED: November 15, 2019                                    BY THE COURT:


                                                           _____
                                                           Nina Y. Wang
                                                           United States Magistrate Judge